# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>One Samsung, model Galaxy S10, cellular phone, IMEI: 354770100513431; seized from Amanal Tigabu ALI and Alexandra Nicole MOCERI | )<br>)<br>)  Case No.  20MJ1593<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C., Sec. 922(g) | Felon in Possession of a Firearm (Felony) |
| 21 U.S.C. § 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute (Felony) |
| 18 U.S.C., Sec. 924(c)(1) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Felony) |

The application is based on these facts:
See Attached Affidavit of FBI Special Agent Taylor Hilderbrand, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Taylor Hilderbrand, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 4/30/2020

*Judge's signature*

City and state: San Diego, California        Hon. Karen S. Crawford, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Taylor R. Hildebrand, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application authorizing a search warrant for the following digital device, currently in the custody of the San Diego Sheriff's Department in San Diego, California, seized from Amanal Tigabu ALI (ALI) and Alexandra Nicole MOCERI ("MOCERI") (collectively the "**Target Subjects**") on March 20, 2020 (more particularly described in Attachment A and incorporated herein):

    a. One Samsung, model Galaxy S10, cellular phone, IMEI: 354770100513431; seized from the **Target Subjects** (the "**Subject Device**").

2. The evidence to be searched for and seized is described in Attachment B, incorporated herein.

3. Based on the information below, there is probable cause to believe that the **Subject Device** is an instrumentality and contains evidence of crimes, specifically, violations of Title 18 U.S.C. § 922(g), Felon in Possession of Firearm/Ammunition, Title 21, United States Code, §§ 841, and 846, Conspiracy to Distribute and Distribution of a Controlled Substance, and Title 18, U.S.C., § 924(c) - Possession of a Firearm in Furtherance of a Drug Trafficking Felony, Title 18, U.S.C. §§ 2 – Aiding and Abetting; (hereinafter collectively referred to as the "**Target Offenses**").

## EXPERIENCE AND TRAINING

4. I am a law enforcement officer of the United States within the meaning of Title 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

5. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since October 2010. I am currently assigned to the San Diego Division, working as a member of the San Diego East County Regional Gang Task Force in El Cajon, California. My duties include the investigation and apprehension of individuals involved

in violent, gang-related activities as well as the illegal trafficking and distribution of firearms and narcotics.

6. I received twenty-one (21) weeks of training at the FBI Academy in Quantico, Virginia. During that training, I learned how narcotics are manufactured, consumed, packaged, marketed, and distributed. Through my employment as an FBI Special Agent, I have become familiar with, and have participated in all the traditional methods of narcotics investigations, including, but not limited to: visual surveillance, questioning of witnesses, the use of search warrants, handling of informants and cooperating witnesses, pen registers, monitoring Title III interceptions, and undercover operations.

7. As an FBI Special Agent, I have performed various tasks which include, but are not limited to:

   a. Functioning as a surveillance agent and thereby observing and recording movements of persons, including gang members, engaged in the illegal trafficking of firearms and narcotics, and those suspected of trafficking in illegal firearms and narcotics;

   b. Tracing monies and assets gained by narcotics traffickers, including gang members, from the illegal sale of narcotics (laundering of monetary instruments); and

   c. Interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of narcotics and distribution of monies and assets derived from the illegal trafficking of narcotics (laundering of monetary instruments).

8. As an FBI Special Agent, I have participated in over 100 arrests for gang-related offenses, including illegal firearms trafficking and narcotics trafficking. I have participated in over 8 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of illegal firearms and narcotics, the execution of search warrants, surveillance in connection with narcotics investigations, and interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of gangs and narcotics trafficking organizations and the various methods these organizations use to carry out their violent crime and narcotics trafficking activities.

9. As an FBI Special Agent, I have participated in several investigations into San Diego-area street gangs and the Mexican Mafia. In particular, I was the co-case agent on an investigation that led to the arrest and prosecution of 12 Mexican Mafia associates and soldiers. We employed a variety of investigative techniques in this investigation, including Title III interceptions of wire communications, consensual monitoring of communications, undercover operations, and a confidential informant. I have also interviewed several Mexican Mafia associates and soldiers. Through the course of this investigation, training, and in conversations with other gang investigators, I have gained substantial knowledge of the Mexican Mafia and Hispanic street gangs as well as investigative techniques necessary to investigate them successfully.

11. The facts set forth herein are those that I believe are relevant to the limited purposes of this affidavit, namely, to establish probable cause for the requested warrant. The affidavit does not, therefore, include each and every fact that I or other law enforcement personnel may have learned in connection with this ongoing investigation. In the affidavit, all dates and times are approximate.

12. I have knowledge of the facts set forth below based on my review of the reports, recorded statements, and evidence collected in this case.

## FACTS SUPPORTING PROBABLE CAUSE

13. On March 20, 2020, a Mazda vehicle bearing California license plate 8NAF263 tried to enter the parking lot for the Barona Casino, which had closed due to the Coronavirus pandemic. A Barona Tribal Enforcement Security Officer responded to investigate the vehicle and its two occupants, including the male driver, later identified as ALI, and a female later identified as MOCERI, in the vehicle. The officer approached the vehicle and knocked on the window. ALI opened the door and immediately began "freaking out." ALI began reaching around the vehicle despite the officer's requests to stop. The officer believed both MOCERI. and ALI to be under the influence of drugs based on their behavior, including ALI's repetitive and non-stop talking. ALI also originally gave a false name to the officer.

14. Believing that ALI was under the influence and may be trying to access a weapon, the officer asked ALI to exit the driver's seat of the vehicle and step outside. The officer asked ALI if he had any weapons and ALI responded, "no." ALI then immediately began to reach into his pockets despite the officer's repeated requests to stop. Based on ALI's erratic behavior, the officer placed ALI in handcuffs to conduct a safety pat-down for weapons. As the officer conducted a pat-down for weapons, a plastic baggie containing suspected drugs fell out of ALI's right jacket pocket and landed on the ground near the rear of the vehicle. The officer then immediately contacted the San Diego Sheriff's Department (SDSD).

15. An SDSD deputy responded to the scene at approximately 11 p.m. ALI then provided the same false name to the deputy. That individual was found to have a Fourth Waiver. A search of the front of the vehicle uncovered a wallet with ALI's identification and ALI eventually admitted to his real identity. A records check showed that ALI also had a Fourth Waiver. A further search of the front of the vehicle uncovered a glass pipe consistent with drug use. A search of a fanny pack that ALI had been wearing, but that was left on the front passenger floorboard, also uncovered a large amount of currency. A plastic baggie of suspected drugs was also located in the vehicle. A further search of ALI's person uncovered more currency and a pill bottle with more suspected drugs.

16. The deputy also found a loaded Ruger IC380 .380 caliber handgun bearing serial number 326-68792 near a pillar where ALI was sitting. A further search of the vehicle uncovered an Adidas duffle bag and a white drawstring bag. The Adidas duffle bag contained a Taurus 9mm handgun bearing serial number TJC27030, a Beretta .22 handgun bearing serial number BBS28238U, miscellaneous ammunition and a plastic Ziploc baggie containing numerous pills marked "M30." Based on his training and experience, the deputy knows "M30" pills are oxycodone pills that sometimes contain fentanyl. The white drawstring bag contained a prescription bottle filled with numerous pills belonging to ALI, bottles of Alprazolam (Xanax), and multiple prescription bottles of unknown pills.

17. A later test of the drugs that dropped from ALI's person indicated the substance was approximately 26 grams (gross) of fentanyl. Because of the dangers associated with fentanyl, the other suspected drugs were not tested. The currency was also counted and determined to be $72,100. Based on his training and experience, the amount of drugs and suspected drugs, and the amount of currency, the deputy believed ALI was selling drugs.

18. MOCERI was also questioned. She stated that the vehicle was being rented by her, but did not claim ownership of any of the drugs or firearms. She also claimed that she was in a relationship with ALI. During their questioning, the **Target Subjects** were separated. The two yelled back and forth to each other and during that exchange, MOCERI implied she was pregnant. MOCERI was released at the scene.

19. While questioned separately, the **Target Subjects** independently provided the same address to the deputy on the scene as their current residence.

20. The **Subject Device** was seized from the vehicle.

21. Based on the nature of their relationship, the location and quantity of the drugs and firearms during the March 20th incident, and her own likely drug use, I believe, based on my training and experience and consultation with other law enforcement officers experienced in drug investigations, MOCERI is aware of ALI's firearms and drug possession and trafficking activities and is either a co-conspirator or aids and abets his firearms possession and/or drug trafficking activities.

22. Preliminary records checks on ALI revealed the following relevant criminal history:

| Date | Court of Conviction | Charge | Term of Imprisonment |
|---|---|---|---|
| 1/07/2018 | CASC – San Diego | (11351 HS ) - Possession of Oxycodone for Sale (Felony) | 3 years prison (stayed) 1 year probation |
| 3/22/2018 | CASC – San Diego | (11351 HS ) - Possession of Oxycodone for Sale (Felony) | 3 years prison (stayed) 1 year probation |

23. The firearms were seized and inspected. Preliminary checks revealed that the firearms were not manufactured in California. Therefore, the firearms traveled in, and/or affected interstate commerce to arrive in the state of California.

24. On April 4, 2020, agents executed a search warrant (20MJ1299) at the **Target Subjects'** residence and seized a loaded 9mm firearm (believed to be made in Italy), $6,100 in cash, various small plastic bags and containers containing small amounts of white crystalline substances suspected to be fentanyl, and approximately 100 pills of unknown drug type (agents did not hand count the pills out of safety concerns that they may contain fentanyl; the true count of pills will be determined at the DEA laboratory).

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS

25. Based on my training and experience as a law enforcement officer and in consultations with other law enforcement officers experienced in illegal firearms possession, trafficking, drug dealing, and trafficking investigations, I am also aware that:

   a. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages;

   b. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs and their accomplices will use cellular telephones to coordinate with each other, contact their buyers and suppliers, and negotiate the purchase or sale of their illegal merchandise;

   c. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their buyers or suppliers will arrive at predetermined locations;

   d. Individuals involved in the illegal possession, acquisition, distribution, and trafficking of firearms and drugs will use cellular telephones to direct buyers or suppliers to synchronize an exact drop-off and/or pick-up time of their illegal merchandise;

   e. Individuals involved in the illegal possession, acquisition, and/or

trafficking of firearms and drugs will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

  f. Because drug dealers are operating a criminal venture (thereby making it unlikely that they will report losses to law enforcement), because their business relies almost exclusively on cash transactions, and because their illicit product, if stolen, is easily resold, drug dealers are often targets for other criminals. Thus, drug dealers and traffickers often arm themselves with firearms and other weapons to protect their person, proceeds, and drugs from rival dealers, customers, and other criminals; and

  g. The use of cellular telephones by individuals involved in the illegal possession, acquisition, and trafficking of firearms and drugs, tend to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

26. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists, and stored text messages. Much of the evidence generated by a person involved in the illegal possession or acquisition of firearms or a drug dealer's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone

27. Based upon my experience and training, consultation with other law enforcement officers experienced in firearms and controlled substance investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the **Subject Offenses**, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, videos, pictures, and other digital information, are stored in the **Subject Device**.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

28. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

8

identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## GENUINE RISKS OF DESTRUCTION

31. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN INFORMATION

32. The United States has previously requested and signed a warrant (20MJ1301) with this Court for the **Subject Device** on April 3, 2020. Unfortunately, due to increased administrative requirements as a result of the COVID-19 pandemic, I was unable to transfer the **Subject Device** into FBI custody before April 15, 2020. On, April 15, 2020, while I was checking the **Subject Device** into FBI Evidence, another agent entered the Evidence Room along with me and the Evidence Technician. Later that day, the other agent began displaying COVID-19-like symptoms. Out of an abundance of caution, everyone in the room, including the Evidence Technician and me, were required to enter into a quarantine status until the other agent could receive the results of his COVID-19 test. Ultimately, his COVID-19 test came back negative and I was released from quarantine. However, that quarantine period extended beyond the expiration of this prior warrant, April 17, 2020. Therefore, that warrant was not executed. The United States is now seeking this revised warrant for the **Subject Device**.

# CONCLUSION

33. Based on my training and experience, and the foregoing facts, I believe there is probable cause to believe the items listed above, as described in Attachment B, which are the fruits, instrumentalities, and evidence of the **Subject Offenses** will be found in the **Subject Device**, as described in Attachment A.

_____
TAYLOR R. HILDEBRAND
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 30th day of April, 2020.

_____
The Honorable Karen S. Crawford
United States Magistrate Judge

10

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

(**Subject Device**) One Samsung Model SM-G970U, cellular phone, IMEI: 354770100513431; seized from Amanal Tigabu ALI (ALI) and Alexandra Nicole MOCERI ("MOCERI")

The **Subject Device** is currently in the possession of the San Diego Sheriff's Department, San Diego, CA.

# **ATTACHMENT B**

## ITEMS TO BE SEIZED

The following evidence to be searched for and seized pertains to violations of Title 18 U.S.C. § 922(g), Felon in Possession of Firearm/Ammunition, Title 21, United States Code, §§ 841, and 846, Conspiracy to Distribute and Distribution of a Controlled Substance, and Title 18, U.S.C., § 924(c) - Possession of a Firearm in Furtherance of a Drug Trafficking Felony, Title 18, U.S.C. §§ 2 – Aiding and Abetting; (hereinafter collectively referred to as the "**Target Offenses**"):

1. Communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a.  tending to indicate efforts to acquire and possess firearms and/or illegally acquire and distribute controlled substances;

    b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the illegal acquisition and possession of firearms and/or the illegal acquisition and distribution of controlled substances;

    c.  tending to identify co-conspirators, criminal associates, sources, or others involved in the acquisition and possession of firearms and/or illegal acquisition and distribution of controlled substances;

    d.  tending to identify travel to or presence at locations involved in the acquisition and possession of firearms and/or illegal acquisition and distribution of controlled substances;

    e.  tending to identify the user of, or persons with control over or access to, the **Subject Device**; and/or

    f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.